legislate in order to remedy what they thought were defects or hardships in the statutory laws, yet this court does not feel justified to do so, in the face of the constitution of the United States, which vests the lawmaking power exclusively in congress. If the creditors of bankrupt estates desire to secure the services of good trustees, they must appeal to congress to amend the law, and either authorize the courts to allow such compensation as receivers in chancery are allowed for their services in the discretion of the court, or otherwise authorize the creditors at their first meeting, and before the trustee is elected by them, to fix the compensation he is to receive, subject to the approval of the court. In the absence of a provision in the law granting such authority to the courts, they are powerless to exercise any discretion beyond the maximum fees given to the trustee by section 48a of the bankruptcy act.

Counsel have called the attention of the court to the decision of a referee in Re Plummer, 3 Am. Bankr. R. 320, in which the trustee was allowed for just such services as were performed by the trustee in this case a reasonable extra compensation in analogy to the case of a receiver; but, with due deference to the learned referee, he seems to have overlooked entirely the provisions of the constitution which divide this government into three separate departments, and define the powers and duties of each. The learned author of Collier on Bankruptcy ([3d Ed.] p. 294), in reviewing this decision of the referee, says:

"It seems that the opinion of the learned referee in the Plummer Case is based on principles of abstract equity. It is a little doubtful, however, in the light of section 48a of the bankruptcy law, providing that the filing fee and the commissions shall be the only compensation of the trustee, whether it will stand."

The trustee in this case has saved at least $10,000 to the estate; he has given his valuable time and ability to the management of his trust; and, if there were any warrant of law for the allowance of extra compensation to him, the court would cheerfully grant it. But, in view of the specific provisions of the bankruptcy act, the court does not feel that there is any authority of law for such an allowance, and his petition must be disallowed; and it is so ordered.

---

### In re FIFE.

(District Court, W. D. Pennsylvania. June 14, 1901.)

No. 1,468.

1. BANKRUPTCY—PROVABLE CLAIMS—BREACH OF PROMISE OF MARRIAGE.

Where in an action for breach of promise of marriage a verdict was recovered before the defendant filed his petition in bankruptcy, on which judgment was entered before he applied for discharge, such claim was provable, under section 63 of the bankrupt law, since it was founded on a contract and reduced to judgment after the filing of his petition, and before the consideration of his application for a discharge.

2. SAME—HABEAS CORPUS.

Where a bankrupt was arrested on a writ of capias ad satisfaciendum under a judgment of a state court entered after he was adjudged a bank-

rupt in a suit for breach of promise of marriage, on a verdict recovered before he filed his petition, he should be discharged on habeas corpus, under general order 30 in bankruptcy (32 C. C. A. xxx., 89 Fed. xii.), since such claim was provable in bankruptcy.

In Bankruptcy.

B. C. Christy, for bankrupt.

E. J. Smart, for creditor.

BUFFINGTON, District Judge. This case arises upon the return to a writ of habeas corpus, granted on petition of Robert Fife, the bankrupt, and directing the sheriff of Allegheny county to produce the said Fife before this court, together with the cause of his detention. On January 8, 1901, one Jennie Hawk obtained a verdict for $1,000 against Fife in the court of common pleas No. 2 of Allegheny county, in a suit brought by her against him in that court. That action was based on a contract to marry, and the damages alleged and recovered were for breach by defendant of such contract. On April 8, 1901, the defendant, who is the present petitioner, filed a petition of voluntary bankruptcy, and was adjudged bankrupt. The above-stated claim of Jennie Hawk was scheduled as a debt. On May 2, 1901, a pending motion for a new trial was discharged, and judgment entered against the defendant. On May 31, 1901, the bankrupt was arrested by the sheriff of Allegheny county on a writ of capias ad satisfaciendum issued in said case, and placed in the jail of Allegheny county. Thereupon the bankrupt prayed issue of a writ of habeas corpus. To this writ the sheriff returns the capias as a cause of detention. General order in bankruptcy provides:

"If the petitioner during the pendency of the proceedings in bankruptcy, be arrested or imprisoned upon process in any civil action, the district court, upon his application, may issue a writ of habeas corpus to bring him before the court to ascertain whether such process has been issued for the collection of any claim provable in bankruptcy and if so provable he shall be discharged; if not, he shall be remanded to the custody in which he may lawfully be."

We therefore inquire, is the Hawk claim, to enforce which the capias issued, provable in bankruptcy? Section 63 of the present bankrupt law, under the heading "Debts which may be proved," provides:

"Debts of the bankrupt may be proved and allowed against his estate which are * * * (4) founded * * * upon a contract express or implied; and (5) founded upon provable debts reduced to judgment after the filing of the petition and before the consideration of the bankrupt's application for a discharge," etc.

The word "debt" in the bankrupt law is not restricted to its strict legal meaning, viz. "a sum of money due by certain and express agreement," but is defined by statute (Bankr. Law, § 1, cl. 11) to "include any debt, demand, or claim provable in bankruptcy." After due consideration, we are of opinion the claim in this case is provable. It is based on contract, and falls within the express terms of the statute recited above. The breach occurred and the right of action accrued before the petition in bankruptcy was filed. The plaintiff's contractual claim was therefore provable under the fourth provision,

above quoted, and was subsequently reduced to judgment under the fifth. Being, then, of opinion the detaining process issued for the collection of a claim provable against the estate of Robert Fife in bankruptcy, it is, therefore, in accordance with general order 30 (32 C. C. A. xxx., 89 Fed. xii.), ordered that said Fife be discharged from custody.

---

### In re DAVIDSON.

(District Court, S. D. Iowa. January 11, 1901.)

1. BANKRUPTCY—VALIDITY OF LIENS—MORTGAGES GIVEN FOR PRESENT CONSIDERATION.

Mortgages taken by a bank from a merchant who was in fact insolvent, to secure loans made to him at the time, and which were properly recorded, are not avoided, under Bankr. Act 1898, by the bankruptcy of the borrower within four months thereafter, where both parties acted in good faith, and the bank did not have knowledge of the borrower's insolvency, although it knew he was indebted, and that the money was borrowed and used to pay creditors.

2. SAME—PREFERENCES—SUBSTITUTION OF SECURITIES.

A mortgage given by an insolvent, within four months prior to his bankruptcy, to a bank, in part to secure money then borrowed, and in part to secure an antecedent debt secured by collateral deposited when the debt was made, is not voidable as a preference, under Bankr. Act 1898, § 60, where the parties acted in good faith, without intention to give or receive a preference, and the collateral was surrendered on the substitution of the mortgage security.

In Bankruptcy. On review of decision of referee.

Lewis Miles and J. L. Parrish, for the bank.

S. G. Susemihl and S. G. Vanauken, for opposing creditors.

McPHERSON, District Judge. A petition in bankruptcy was filed against Davidson, July 28, 1899, and August 18, 1899, he was adjudged a bankrupt. The bankrupt did a general business as a merchant at Garden Grove, Iowa, selling implements, buggies, etc. He had a branch house at Cainesville, Mo. He was in business from October, 1898, until he was adjudged a bankrupt. The bank is a partnership concern, and Davidson did his banking business with the bank all the time he was in business as aforesaid. July 8, 1899, Davidson gave the bank a chattel mortgage covering 27 buggies and carriages located in a building a couple of blocks distant from his main warehouse, in Garden Grove, which mortgage was to secure $550 in money that day borrowed, and which money was parted with by the bank on the strength of the mortgage security. July 13, 1899, Davidson gave the bank another mortgage to secure $950. Of this sum on the delivery of the mortgage the bank gave him $355. The remaining $595 covered by the mortgage had been loaned him by the bank at a time five to eight weeks prior, to secure which the bank held notes of third parties aggregating $900. Upon receipt of this mortgage, the bank, in addition to the $355, turned him back the notes of the third parties for $900, all of which was one transaction. At the time of taking this mortgage the bank took possession