Melvyn SIEGEL, Petitioner,

v.

Richard E. LYNG, Secretary of Agriculture United States Department of Agriculture, et al. and United States of America.

No. 84–1047.

United States Court of Appeals, District of Columbia Circuit.

Argued April 12, 1988.

Decided July 12, 1988.

John H. Vetne, Washington, D.C., for petitioner.

Harry S. Gold, Atty., Dept. of Agriculture, with whom James Michael Kelly, Associate General Counsel, Raymond W. Fullerton, Asst. General Counsel, Margaret M. Breinholt, Deputy Asst. General Counsel and Aaron B. Kahn, Atty., Dept. of Agriculture, Washington, D.C., were on the brief, for respondents.

Before WALD, Chief Judge, ROBINSON and STARR, Circuit Judges.

Opinion for the Court filed by Chief Judge WALD.

WALD, Chief Judge:

## I. INTRODUCTION

Melvyn Siegel, petitioner, was President, Director, and majority shareholder of Finer Foods Sales Company (Finer Foods). Upon citation for flagrant, repeated violations of the Perishable Agricultural Commodities Act, as amended (Act or PACA), 7 U.S.C. §§ 499a–499s, *see Finer Foods Sales Co., Inc. v. Block*, 708 F.2d 774 (D.C.Cir.1983) (affirming Secretary of Agriculture's decision that Finer Foods violated Act), Finer Foods sold all its assets to L.M. Sandler & Sons, Inc. (Sandler & Sons). Sandler & Sons also hired Siegel.

The present action involves the subsequent efforts by the Agriculture Department's Agricultural Marketing Service, Fruit and Vegetable Division (AMS) to enforce PACA Section 8(b) employment restrictions against Siegel because of his being "responsibly connected" with Finer Foods. Siegel challenges his one year employment bar on statutory grounds as well as on the ground that the statute violates Due Process and Bill of Attainder proscriptions. Because we hold that neither constitutional argument is valid and that the Department construction of PACA is cor-

rect, we affirm the employment bar that was issued pursuant to proper procedures.

## II. BACKGROUND

### A. *Legislative Background*

PACA was enacted in 1930 as a licensing scheme to regulate transactions in perishable agricultural commodities. The legislation was prompted by unfair dealer practices in the industry, which harmed growers and shippers alike. The statutory mechanism erected to correct these abuses was succinctly described by this Court in *Quinn v. Butz*, 510 F.2d 743, 746–47 (D.C. Cir.1975), as follows:

> In broad outline, the Act regulates the shipment of perishable agricultural commodities in interstate and foreign commerce through a system of licensing and administrative supervision of the conduct of licensees. Commission merchants, dealers and brokers in such commodities must obtain from the Secretary of Agriculture a license as a precondition to

doing business.[1] By Section 2, licensees are forbidden to engage in specified unfair practices,[2] which include failure to make full payment promptly for commodities dealt in.[3] An unfair practice subjects the licensee to liability to the injured party for damages, recoverable either in a proceeding before the Secretary or by suit in court.[4] The Secretary is authorized to investigate complaints of unfair practices [5] and, finding a violation, to issue a reparation order requiring the offending licensee to pay damages.[6] Failure to obey the order automatically suspends the license during noncompliance.[7]

The Secretary is also empowered to suspend or revoke licenses for unfair practices,[8] and to limit employment within the industry of those who violate the Act and those who are "responsibly connected" with violators.[9] Section 8(b) of the Act, in respects highly relevant to this case, provides that except with the

---

1. [Footnotes renumbered] Perishable Agricultural Commodities Act §§ 3, 4, 7 U.S.C. §§ 499c, 499d (1970).

2. *Id.* § 2, 7 U.S.C. § 499b (1970).

3. *Id.* § 2(4), 7 U.S.C. § 499b(4) (1970).

4. *Id.* § 5, 7 U.S.C. § 499e (1970).

5. *Id.* § 6, 7 U.S.C. § 499f (Supp. III 1973).

6. *Id.* § 7(a), 7 U.S.C. § 499g(a) (Supp. III 1973).

7. "Unless the licensee against whom a reparation order has been issued shows to the satisfaction of the Secretary within five days from the expiration of the period allowed for compliance with such order that he has either taken an appeal as herein authorized or has made payment in full as required by such order his license shall be suspended automatically at the expiration of such five-day period until he shows to the satisfaction of the Secretary that he has paid the amount therein specified with interest thereon to date of payment: *Provided,* That if on appeal the appellee prevails or if the appeal is dismissed the automatic suspension of license shall become effective at the expiration of thirty days from the date of the judgment on the appeal, but if the judgment is stayed by a court of competent jurisdiction the suspension shall become effective ten days after the expiration of such stay, unless prior thereto the judg-

ment of the court has been satisfied." *Id.* § 7(d), 7 U.S.C. § 499g(d) (1970).

8. "Whenever (a) the Secretary determines, as provided in [§ 6], that any commission merchant, dealer, or broker has violated any of the provisions of [§ 2], or (b) any commission, merchant, dealer, or broker has been found guilty in a Federal court of having violated [§ 14(b)], the Secretary may publish the facts and circumstances of such violation and/or, by order, suspend the license of such offender for a period not to exceed ninety days, except that, if the violation is flagrant or repeated, the Secretary may, by order, revoke the license of the offender...." *Id.* § 8(a), 7 U.S.C. § 499h(a) (1970).

9. *Id.* § 8(b), 7 U.S.C. § 499h(b) (1970), which in relevant part provides:

    > Except with the approval of the Secretary, no licensee shall employ any person, or any person who is or has been responsibly connected with any person—(1) whose license has been revoked or is currently suspended by order of the Secretary; (2) who has been found after notice and opportunity for hearing to have committed any flagrant or repeated violation of section 499b of this title, but this provision shall not apply to any case in which the license of the person found to have committed such violation was suspended and the suspension period has expired or is not in effect; or (3) against whom there is an unpaid reparation award issued within two years, subject to his right of appeal under section 499g(c) of this title....

Secretary's approval no licensee may employ any person, or anyone "responsibly connected" with a person, whose license has been revoked or is currently suspended, or who has been found to have committed any flagrant or repeated violation of Section 2, or against whom there is an unpaid reparation order issued within two years.[10] Section 1(9), another provision bearing importantly on this case, specifies that a person is "responsibly connected" with an offending licensee if he is affiliated with the licensee as officer, director or holder of more than 10% of its outstanding stock.[11]

*Id.* at 746–47.

## B. *Factual Background*

The factual history of the case is set out in *Finer Foods Sales Co., Inc. v. Block,* 708 F.2d 774 (D.C.Cir.1983). Briefly, petitioner-Siegel was President, Director, and majority shareholder of Finer Foods, a company adjudged to have committed flagrant and repeated violations of PACA. *Id.; see also* Joint Appendix (J.A.) at 2, 35. Finer Foods' assets were sold to Sandler & Sons in July, 1979, and on August 1, Sandler & Sons hired Siegel as an employee. Sandler & Sons is also a PACA licensee.

Because AMS was pursuing charges of PACA violations by Finer Foods, the agency notified Sandler & Sons that Siegel's responsible connection to Finer Foods would disqualify him from industry employment for one year. *See id.* at 2–4. Once Finer Foods was found to have violated the Act, AMS sent formal notice of Siegel's employment ineligibility. *See id.* at 27, 35. Siegel did not make timely contest of this responsible connection conclusion. Instead, on January 4, 1984, Siegel filed the present opposition to this employment restriction, claiming that the bar vio-

lates statutory and constitutional protections.

## III. ANALYSIS

This Court's line of cases involving PACA employment restrictions, culminating in the recent *Veg–Mix, Inc. v. United States Department of Agriculture,* 832 F.2d 601 (D.C.Cir.1987), is largely dispositive of Siegel's statutory challenge to his bar from *any* employment with Sandler & Sons and also of his Bill of Attainder attack on the "responsibly connected" classification itself.

## A. *Employment Bar*

■ Siegel's statutory challenge to PACA—his objection to a sanction that forbids employment by a licensee even in positions unrelated to the PACA regulatory scheme—must fail as contrary to express statutory language. Siegel urges this Court to exempt non-PACA work for diversified PACA licensees from the employment bar against sanctioned persons. *See* Brief of Petitioner at 20–27. Yet section 499h(b) states that

*no licensee shall employ* any person, or any person who is or has been responsibly connected with any person—(1) whose license has been revoked or is currently suspended by order of the Secretary; (2) who has been found after notice and opportunity for hearing to have committed any flagrant or repeated violation of section 449b of this title....

7 U.S.C. § 499h(b) (emphasis added). Finer Foods was found by this court to have committed such flagrant and repeated violations. *Finer Foods Sales Co., Inc v. Block,* 708 F.2d 774 (D.C.Cir.1983). Not only is section 499h(b)'s employment bar phrased as an absolute, but also the Act

---

**10.** See [sic] note [9] *supra.* The Secretary is authorized to approve such employment at any time following nonpayment of a reparation award, or after one year following the revocation award, or after one year following the revocation or finding of flagrant or repeated violation, upon the posting of bond. *Id.* The Secretary may also approve employment without bond after the expiration of two years from the effective date of the disciplinary order. *Id.*

**11.** "The term 'responsibly connected' means affiliated or connected with a commission merchant, dealer, or broker as (A) partner in a partnership, or (B) officer, director, or holder of more than 10 per centum of the outstanding stock of a corporation or association...." *Id.* § 1(9), 7 U.S.C. § 499a(9) (1970).

elsewhere defines employment as *"any affiliation* of any person with the business operations of a licensee, with or without compensation, including ownership or self-employment." 7 U.S.C. § 499a(10) (emphasis added). This Court in *Quinn* explicitly remarked that Congress had approved a " 'clear and equitable' rule that denied him [PACA violator] *any* employment, for the pertinent period, rather than require a new determination of precisely which positions were closed." 510 F.2d at 756 (emphasis added) (footnote omitted).

Indeed, Congress amended the Act in 1963 precisely to clarify this comprehensive bar. Immediately prior to the 1962 amendments, the Secretary was authorized to sanction licensees only when these employers hired a violator (or responsibly connected person) for a "responsible position." Because this determination proved difficult to administer, the qualification was deleted altogether in 1962. Congress explained the deletion with statements that prove an intent to incorporate an expansive employment bar. The House Committee on Agriculture, for example, stated:

> At present the act applies only to the employment of a person in a responsible position. This has caused serious difficulties due to the problem of delineating what constitutes a responsible position under all circumstances and the difficulty of ascertaining the true nature of the employee's relationship with the licensee.

H.R.Rep. No. 1546, 87th Cong., 2d Sess. 8 (1962), U.S.Code Cong. & Admin.News 1962, p. 2749. Likewise, an earlier report from the same committee observed:

> Experience has demonstrated that it is not possible to obtain satisfactory evidence to prove that a person holds a 'responsible' position if his employer and he want to hide their working arrangement.... It is believed that the limitations on employment should apply to any-

one on the payroll of a licensee with the standard debarment periods or bonding requirements dependent on the nature of the violation.

*House Committee on Agriculture Hearings on Perishable Agricultural Commodities,* 87th Cong., 1st Sess. 15 (1961). This investigatory difficulty, compounded in cases where, as here, the new employer-licensee has acquired all the assets of the violating company, confirms the reasonableness of Congress' amendment barring *any* employment for the proscribed period.

### B. Bill of Attainder

■ Siegel attacks the PACA employment bar as contrary to the Bill of Attainder Clause, Article I, § 9 of the United States Constitution.[12] However, the very definition of a Bill of Attainder—a " 'law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial,' " *Selective Serv. Sys. v. Minnesota Public Interest Research Group,* 468 U.S. 841, 846–47, 104 S.Ct. 3348, 3351–52, 82 L.Ed.2d 632 (1984) (quoting *Nixon v. Administrator of General Services,* 433 U.S. 425, 468, 97 S.Ct. 2777, 2803, 53 L.Ed.2d 867 (1977))—points to its inapplicability to PACA's employment restrictions. This provision does not infringe the Bill of Attainder Clause because the statutory presumption both is rebuttable in adjudicatory proceedings and also is non-punitive in nature.

Broadly speaking, the Bill of Attainder Clause is a further constitutional iteration of the separation of powers logic that structures our government. Whereas Congress may properly legislate to bar persons with certain characteristics from specific activities, the task of determining who possesses these characteristics is generally assigned to the judiciary. *See United States*

---

12. Siegel's Due Process challenge, as noted at oral argument, parallels his Bill of Attainder argument. Because we adhere to the *Quinn* characterization of the employment bar as a rebuttable presumption, we do not need to consider case law overturning irrebuttable presumptions. Numerous courts have affirmed Congress' rational purpose under the Commerce

Clause to regulate the free flow of perishable agricultural commodities through PACA restrictions. *See, e.g., Rothenberg v. H. Rothstein & Sons,* 183 F.2d 524, 526 (3d Cir.1950); *cf. Mobile, J. & K. C.R. Co. v. Turnipseed,* 219 U.S. 35, 43, 31 S.Ct. 136, 138, 55 L.Ed. 78 (1910) (legislative presumption of fact must be based on rational inference).

*v. Brown,* 381 U.S. 437, 454 n. 29, 85 S.Ct. 1707, 1718 n. 29, 14 L.Ed.2d 484 (1965). Section 499h(b) of PACA describes the characteristic that may disqualify persons from industry employment as *responsible connection* with entities that violate the Act. Nonetheless, as construed by this Court, characterization as a "responsibly connected" person is rebuttable, not absolute. *See Quinn,* 510 F.2d at 751. In that case, this Court required corporate veil piercing on the issue of responsible connection; ultimately, the Court exonerated petitioner-Quinn as not having been responsibly affiliated with the culpable company because his officership was shown to be entirely nominal.

This Court twice has expressly reaffirmed this reading of section 499a(9). *See Veg–Mix, Inc. v. United States Department of Agriculture,* 832 F.2d 601, 611 (D.C.Cir.1987); *Minotto v. United States Department of Agriculture,* 711 F.2d 406, 408 (D.C.Cir.1983).[13] Petitioner erroneously attempts to minimize this Court's departure from other circuits' irrebutable presumption analysis of section 499a(9) by arguing that *Martino v. United States Department of Agriculture,* 801 F.2d 1410 (D.C.Cir.1986), permits no consideration of matters beyond the *bona fides* of the persons in question. *See* Reply Brief of Petitioner at 3–4 n. 1. However, *Martino* itself states that in a hearing, the charged person may show that she *"somehow ... does not belong in any of the statutory categories of responsible connection...."* *Martino,* 801 F.2d at 1414 (emphasis added). More decisive, in *Veg–Mix,* this Court expressly applied our decisional law's culpability concept, noting *Minotto's* rule that a " 'finding of liability under section 499h of the Act must be premised upon personal fault or the failure to "counteract or obviate the fault of others." ' " *Veg–Mix,* 832 F.2d at 611 (quoting *Minotto,* 711 F.2d at 408 (quoting *Quinn,* 510 F.2d at 756)) (footnote omitted).

The instant case involves a record that fully supports the Secretary's determination that Siegel was personally at fault or had the capacity to prevent others' fault, hence was "responsibly connected" with Finer Foods during the time when the company violated the Act. *Cf. Zwick v. Freeman,* 373 F.2d 110, 115 (2d Cir.) ("it is inconceivable that petitioners were unaware of their financial condition and unaware that every additional transaction they entered into was likely to result in another violation of the Commodities Act"), *cert. denied,* 389 U.S. 835, 88 S.Ct. 43, 19 L.Ed.2d 96 (1967). *See generally, Community Nutrition Institute v. Young,* 773 F.2d 1356, 1364 (D.C.Cir.1985) (agency may dispense with hearing when no material issue of fact exists), *cert. denied,* 475 U.S. 1123, 106 S.Ct. 1642, 90 L.Ed.2d 187 (1986). Siegel was President and Director of the company throughout the period when violations occurred. This is dissimilar to the nominal vice president in *Quinn,* to the clerical employee designated director in *Minotto,* or to petitioner-Harris' absence from the violating company in *Veg–Mix.* Siegel also held three-fourths of the company's stock. By contrast, petitioners in *Quinn* and *Minotto* possessed no shares at all. Most clearly in *Martino,* this Court held that approximately twenty per cent stock ownership would suffice to make a person accountable for not controlling delinquent management. *See also Veg–Mix,* 832 F.2d at 611 ("Majority ownership obviously suffices [for a finding of responsible connection].") In his capacity as President and Director, Siegel himself was the delinquent management. Moreover, his was the majority shareholder voice. Thus his " 'actual, significant nexus with the violating company' " is uncontrovertable, *Martino,* 801 F.2d at 1414 (citing *Minotto* ), indeed, the nexus is precisely that envisioned by Congress when it employed the phrase "responsibly connected."

Also determinative, we find that section 499h(b) does not inflict "punishment" forbidden by the Bill of Attainder Clause, but

---

**13.** Petitioner's reference to contrary interpretations of PACA by other circuits is inapposite. *See, e.g., Pupillo v. United States,* 755 F.2d 638, 643–44 (8th Cir.1985) (section 499a(9) is per se rule of accountability); *Birkenfield v. United States,* 369 F.2d 491, 494 (3d Cir.1966) (same).

rather is a statutory civil penalty to assist regulatory enforcement of the Act. *See Zwick v. Freedman,* 373 F.2d 110, 119–20 (2d Cir.) (section 499h(b) is not Bill of Attainder), *cert. denied,* 389 U.S. 835, 88 S.Ct. 43, 19 L.Ed.2d 96 (1967); *see also Birkenfield v. United States,* 369 F.2d 491, 494 (3d Cir.1966) (section 499h(b) is not unconstitutional). The line of Supreme Court law on the Bill of Attainder Clause indicates that legislation will survive Bill of Attainder attack if the statute furthers nonpunitive legislative purposes. *See Selective Service System v. Minnesota Public Interest Research Group,* 468 U.S. 841, 852, 104 S.Ct. 3348, 3355, 82 L.Ed.2d 632 (1984) (inquiry is whether the law under challenge, "viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes") (citing) *Nixon v. Administrator of General Services,* 433 U.S. 425, 475–76, 97 S.Ct. 2777, 2806–07, 53 L.Ed.2d 867 (1977); *De Veau v. Braisted,* 363 U.S. 144, 160, 80 S.Ct. 1146, 1155, 4 L.Ed.2d 1109 (1960) ("The question ... is whether the legislative aim was to punish that individual for past activity, or whether the restriction of the individual comes about as a relevant incident to a regulation of a present situation...."); *Hawker v. New York,* 170 U.S. 189, 196, 18 S.Ct. 573, 576, 42 L.Ed. 1002 (1897) (same).

■ Legitimate justifications for the employment restriction, noted earlier, are evident, indeed are paramount, both in the AMS's present use of the temporary bar, and also in the legislative record relevant to the 1962 amendments. *See supra* Section III.A; *see also Whitney v. Heckler,* 780 F.2d 963, 974 (11th Cir.1986) (approving *Zwick* finding that PACA employment restrictions are reasonable regulatory-enforcement scheme, hence escape Bill of Attainder prohibition). This Court recently echoed Congress' express purpose behind the PACA enforcement regime, including

the employment restrictions: namely, that the Act's "special sanctions against dishonest or unreliable dealing" "help instill confidence in parties dealing with each other on short notice, across state lines and at long distances...." *Veg-Mix,* 832 F.2d at 604.[14] This legislative and executive resolve to guarantee that PACA transactions by firms employing persons "responsibly connected" to disciplined licensees be conducted with easy-to-monitor, scrupulous compliance with the Act is ample justification for the temporary employment bar.

### IV. CONCLUSION

Because we find no legal error in the Secretary's conclusion that Congress intended to bar temporarily persons "responsibly connected" to PACA violators from *any* employment with employer-licensees, and because we decide that section 499h(b)'s employment restrictions as applied to petitioner–Siegel survive Due Process and Bill of Attainder challenges, we deny Siegel's petition for review.

---

**14.** Note that Congress employs a "responsibly connected" classification, coupled with *Quinn*-type hearings, to determine business unfitness in numerous regulated industries. *See, e.g.,* 21 U.S.C. § 467 (government may withdraw, indefinitely, inspection services to entities in poultry industry where persons "responsibly connected" to entity are found to have violated food laws); 21 U.S.C. § 671 (same—meat food products industry); 21 U.S.C. § 1047 (same—egg products industry); 7 U.S.C. § 86 (same—grain products industry).